Aponte Jiménez, Juez Ponente
*636 TEXTO COMPLETO DE LA RESOLUCION
Mediante el recurso de certiorari que nos ocupa se solicita que revoquemos una sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan. La misma denegó el recurso de revisión presentado ante dicho foro por la Asociación de Residentes de la Urbanización La Mansión, Inc. (en adelante la Asociación), solicitando que se revocara una resolución emitida por la Junta de Planificación de Puerto Rico (en lo sucesivo la "Junta"), la cual aprobó una consulta de ubicación presentada por Levitt Homes (Levitt) para el desarrollo de una urbanización.
Veamos los hechos pertinentes. El 18 de junio de 1993 Levitt presentó ante la Junta la consulta de ubicación número 93-14-0448-JPU con el propósito de desarrollar un proyecto residencial unifamiliar en una finca con cabida de 22.82 cuerdas localizada en la intersección de la carretera estatal Núm. 866 con la Avenida Boulevard en el Barrio Palmas de Cataño. El referido inmueble colinda por el Norte y Oeste con terrenos propiedad del Estado Libre Asociado de Puerto Rico; por el Sur con la urbanización Mansión del Norte; y por el Este con el Canal de Río Hondo. Dicha finca, según el Mapa de Zonificación vigente, estaba zonificada como distrito residencial de baja densidad poblacional (R-l)-
El desarrollo urbano objeto de la consulta consiste en 118 unidades de vivienda en solares con cabida mínima de 300 metros cuadrados. De la resolución emitida por la Junta se desprende que el acceso propuesto al desarrollo es por la Calle 19 de la Urb. Mansión del Norte, a la Calle 10 de la misma urbanización, a la Calle 1 Norte y saliendo por la Avenida Sabana Seca hacia la intersección con la Carretera Estatal Número 167.
La Junta celebró vista pública para evaluar la consulta de ubicación. De los autos y de la sentencia recurrida, se desprende que consideró, evaluó y analizó los documentos sometidos en torno al proyecto por las siguientes agencias: la Autoridad de Carreteras y Transportación; el Departamento de Recursos Naturales; el Cuerpo de Ingenieros del Ejercito de los Estados Unidos; la Autoridad de Acueductos y Alcantarillados; la Autoridad de Energía Eléctrica; el Alcalde del Municipio de Cataño; la Junta de Calidad Ambiental; y los vecinos y residentes de la Urbanización La Mansión. Los comentarios suministrados a la Junta endosaban la viabilidad del proyecto. El Municipio de Cataño y la Asociación se opusieron al proyecto. La resolución emitida por la Junta hace alusión a que ”[l]a mayor objeción de los vecinos, así como del alcalde, es por el control de acceso existente para que no sea destruido."
El 17 de agosto de 1994 la Junta emitió resolución. Aprobó la consulta de ubicación. Dispuso que el proponente "deberá" cumplir con las recomendaciones de la Junta de Calidad Ambiental y demás agencias concernidas. Resolvió que el desarrollo propuesto en el predio antes mencionado era viable como un "proyecto extenso" considerando las leyes, los reglamentos de zonificación, las normas de planificación, las proyecciones poblacionales y los estudios ambientales pertinentes. La Asociación y el Municipio solicitaron, separadamente, reconsideración. Ambas fueron denegadas mediante resolución emitida por la Junta.
Inconforme, la Asociación presentó recurso de revisión ante el Tribunal de Primera Instancia, Sala Superior de San Juan. Solicitó que se dejara sin efecto la resolución emitida por la Junta autorizando la consulta de ubicación. Alegó que ésta erró al determinar que: (1) el proyecto cumple con el Plan de Usos de Terrenos para la Región Metropolitana de San Juan adoptado por la Junta (en lo sucesivo PUT-RMSJ); (2) no era necesario autorizar una variación en el uso de terrenos ante su consideración; (3) no existía una servidumbre de paso sobre los predios de la urbanización La Mansión; (4) la consulta sometida se llevó a cabo en cumplimiento con la Ley de Política Pública Ambiental.
*637 El tribunal a quo denegó el recurso instado. Concluyó que de la totalidad del récord ante sí, surge que "[l]as determinaciones de la Junta se encuentran ampliamente apoyadas y sustentadas por la prueba sometida ante la agencia". Dictaminó que los autos reflejan "que el proyecto ante la consideración de la Junta caía dentro de la categoría de proyecto■ extenso. Esto hacía posible la rezonificación de los terrenos sin tener que cumplir con los requisitos exigidos para las variaciones en uso". Expresó que "[e]n el presente caso no estamos ante una situación de naturaleza arbitraria, ilegal o irrazonable que nos mueva a intervenir con las determinaciones efectuadas por la Junta de Planificación".
Aún inconforme con el dictamen emitido por el tribunal de primera instancia, la Asociación instó ante este Foro el presente recurso de certiorari. Nos señala, en esencia, que incidió el tribunal al: (1) no considerar el derecho de propiedad envuelto en relación a la servidumbre de paso que la Junta constituyó sin autoridad legal para ello; (2) no considerar que el proyecto incumple con el PUT-RMSJ; (3) no considerar el incumplimiento por parte de la Junta de la Ley de Política Pública Ambiental; (4) determinar que la Junta no tenía que cumplir con las disposiciones del Reglamento de Zonificación de Puerto Rico, Reglamento Núm. 4, sobre la concesión de variaciones.
Levitt se opone. Alega que la Junta en ningún lugar establece una servidumbre de paso. Sólo autoriza el acceso del proyecto propuesto por la vías públicas de la urbanización La Mansión. Sostiene, asimismo, que el proyecto cumple con el PUT-RMSJ. Aduce que la Junta cumplió con las disposiciones de Ley de Política Pública Ambiental. Finalmente, señala que la Junta aprobó la consulta de ubicación como "desarrollo extenso" sin que sea necesario utilizar el mecanismo de variación.
Luego de estudiar los alegatos de las partes, y por los fundamentos que a continuación exponemos, acordamos denegar la expedición del auto solicitado.
Mediante su primer señalamiento de error, la Asociación argumenta que la resolución emitida por la Junta constituyó una servidumbre de paso sobre la urbanización La Mansión. Añade que tal actuación excede las facultades de la Junta e interfiere con las prerrogativas y derechos sobre las calles públicas bajo la jurisdicción de los municipios de Puerto Rico. El señalamiento de error de la recurrente aparenta descansar en que el Municipio de Cataño tiene un "derecho de propiedad" sobre las calles de la urbanización La Mansión y, por lo tanto, puede prohibir el acceso a las mismas. No le asiste la razón. Aunque la Junta no estableció servidumbre alguna sobre la urbanización La Mansión, sino que más bien determinó que el único acceso disponible para el desarrollo propuesto por Levitt era por la calle 19 de la urbanización La Mansión, tal pretensión nos conduce a discutir someramente la naturaleza, el ámbito y el alcance de la facultad de los gobiernos municipales para regular el acceso a las calles públicas bajo su jurisdicción.
De entrada, resulta primordial reconocer la naturaleza pública de las calles y caminos municipales. Así lo dispone el Art. 256 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 1025, al establecer que son bienes de uso público "... los caminos estaduales y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos y las obras públicas de servicio general, costeadas..." por los municipios o por el gobierno estatal. Ya desde principios de siglo se consagró que los ciudadanos tienen derecho al uso libre y continuo de sus calles, aceras y plazas. Saldaña v. Consejo Municipal de San Juan, 15 D.P.R. 37, (1909). 
Ciertamente, la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. sees. 64 - 64h, faculta a los municipios a conceder permisos para el control de acceso del tráfico de vehículos de motor y el uso público de las vías, calles, urbanizaciones y comunidades residenciales bajo su jurisdicción. El propósito principal de esta legislación es proveer un instrumento de participación ciudadana dirigido a controlar la incidencia criminal que azota a nuestras comunidades. Véase, Exposición de Motivos, Ley Núm. 21, supra, Leyes de Puerto Rico, 1987, pág. 67.
El concepto de control de acceso de la mencionada ley, no implica ni conlleva un cambio en la naturaleza pública de las calles residenciales. Caquías Mendoza v. Asoc. de Residentes de Mansiones de Río Piedras, 93 J.T.S. 127, a la pág. 11071. Se trata de un mecanismo apoyado en delicada política pública que "requiere armonizar el interés de los ciudadanos en su seguridad y bienestar, con los *638 derechos de propiedad y de libertad de otras personas...". Id.
Reconocemos que la Ley Núm. 21, supra, no anticipó específicamente la controversia que se suscita cuando el desarrollador de una nueva urbanización propone acceso a la misma por la calle de una urbanización con control de acceso lo cual es objetado por los residentes de la calle con el acceso controlado. Ello no implica que podamos abstraemos de que dicha ley sí contempla el control de acceso de calles, urbanizaciones o comunidades cuyas vías públicas se utilizan también como medio de entrada y salida de otras calles, urbanizaciones o comunidades. Sobre ese particular la sección 1 de la Ley 21 dispuso que los municipios podrán conceder permisos para el control de acceso vehicular en las vías públicas de urbanizaciones o comunidades "cuyas vías públicas se usen como medios de entrada a, o salida de, otras calles, urbanizaciones, o comunidades, siempre y cuando:
(a) La otra calle, urbanización o comunidad tenga vías públicas alternas de entrada y salida y en caso que no tenga tales vías, se garantice a cada propietario y a cada residente los medios adecuados y necesarios de acceso vehicular a la calle, urbanización o comunidad en que se reside sin carga alguna en igualdad de condiciones. (Enfasis suplido.)
(b) No se impida, obstaculice o limite a los propietarios y residentes de la otra calle, urbanización o comunidad el flujo vehicular y peatonal por las vías y aceras públicas que tengan continuidad entre las calles, urbanizaciones o comunidades de que se trate." (Enfasis suplido.)
Ley Núm. 21, supra, 23 L.P.R.A. see. 64.
Como se puede apreciar, el espíritu de la Ley Núm. 21 persigue armonizar los intereses de las comunidades que desean controlar el acceso a sus calles con los derechos de los vecindarios aledaños que utilizan las mismas vías públicas como su acceso de entrada y salida. No se nos escapa el hecho de que a tenor del texto de dicha ley, ésta parece sólo contemplar la situación de las comunidades ya existentes que se afectarían por el propuesto control de acceso. No obstante, ajuicio nuestro, para que el espíritu y propósito de la ley cobren vigencia y sentido, debemos conciliar los intereses en conflicto entre las urbanizaciones que gozan de un control de acceso y los propietarios de inmuebles colindantes que deseen desarrollar una nueva urbanización y su único acceso posible es por las vías públicas o calles con acceso controlado.
Lo anteriormente expresado nos lleva a concluir que los municipios no tienen un monopolio para prohibir el acceso a la calles públicas de una urbanización con control de acceso en situaciones como la que nos ocupa. La dinámica propiciada por el estatuto se garantiza en la medida que los municipios puedan establecer las condiciones justas y razonables mediante las cuales un nuevo desarrollo residencial se le permita integrarse por las calles de una urbanización con acceso controlado, sin desatender el interés de esa comunidad para velar por su seguridad y bienestar. Ante ese trasfondo, nada impide, por el contrario se impone, que el municipio ejerza un papel protagónico a los fines de establecer las condiciones y restricciones necesarias para armonizar y salvaguardar en justicia los intereses en conflicto manteniendo el control de acceso actual. Cf., Caquías Mendoza, supra. Resolver lo contrario facultaría a los municipios a impedir el desarrollo de fincas aledañas a urbanizaciones con acceso controlado que no tengan otras posibilidades reales de acceso. Bajo las circunstancias que nos ocupan, ese poder podría convertirse en un ejercicio arbitrario de limitaciones injustas a los derechos de los propietarios colindantes. El error no se cometió.
Los señalamientos de error segundo, tercero y cuarto realmente cuestionan la interpretación de la ley y del reglamento realizado por la Junta y, en cierta medida, las conclusiones de hechos de la misma. En la discusión de ese error comenzamos por delimitar el alcance de nuestra función revisora en relación con las determinaciones de los organismos administrativos.
La Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. see. 2175, dispone que [l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal si se basan en evidencia sustancial que obra en el expediente administrativo". Esta disposición estatutaria recoge "la normativa jurisprudencial de que, de ordinario, los tribunales no intervendrán con las determinaciones de hechos de un organismo administrativo si las mismas están sostenidas por *639 evidencia sustancial que surja del expediente administrativo considerado en su totalidad". Metropolitana, S.E. v. A.R.P.E., 95 J.T.S. 39, a la pág. 767.
Se considera evidencia sustancial aquella "...que una mente razonable podría aceptar como adecuada para sostener una conclusión", Hilton Hotel Int’l. v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953), aunque del propio expediente surja prueba conflictiva de la cual pueda inferirse una conclusión distinta a la de la agencia. J.R.T. v. Línea Suprema, Inc., 89 D.P.R. 840, 849 (1964). No es evidencia sustancial, sin embargo, cuando la parte que recurre de las determinaciones de la agencia demuestra la existencia de "...otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración". Metropolitana, S.E. v. A.R.P.E., supra.
De igual forma, las conclusiones e interpretaciones de las agencias administrativas merecen gran consideración y respeto. La revisión judicial en esos casos se limita a determinar si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituya un abuso de discreción. Fuertes v. A.R.P.E., 93 J.T.S. 165, a la pág. 11385; Murphy Bernabe v. Tribunal Superior, 103 D.P.R. 692, 699 (1975). Véase, además, Oyola y otros v. Junta de Calidad Ambiental, 97 J.T.S. 25, a la pág. 662; Metropolitana, S.E. v. A.R.P.E., supra. "[L]a función judicial se cumple cuando se encuentra una base racional para las conclusiones de la agencia administrativa, sin que deba llegarse en dicha función a sustituir el criterio del tribunal por el de la agencia cuya actuación —generalmente en materia especializada— se intenta revisar". J.R.T. v. Escuela Coop. E.M. De Hostos, 107 D.P.R. 151, 164 (1978); Ledesma, Admor. v. Tribunal de Distrito, 73 D.P.R. 396, 401 (1952).
Tal norma de deferencia judicial se funda en la experiencia y conocimiento especializado de las agencias sobre los asuntos dentro del ámbito de sus facultades y responsabilidades. Facultad de Ciencias Sociales v. C.E.S., 93 J.T.S. 88, a la pág. 10783; Asoc. de Doctores v. Morales, 93 J.T.S. 12, a la pág. 10349; Agosto Serrano v. F.S.E., 93 J.T.S. 37, a la pág. 10510. Debido a ello debemos ser cautelosos al intervenir con las actuaciones administrativas. Metropolitana, S.E. v. A.R.P.E., supra; Fuertes v. A.R.P.E., supra; Viajes Gallardo v. Clavell, 92 J.T.S. 90 a la pág. 9685. Igualmente, estamos obligados a reconocer que existe una presunción de legalidad y corrección a favor de las decisiones administrativas. A.R.P.E. v. Junta de Apelaciones sobre Construcciones y Lotificaciones, 124 D.P.R. 858, 864 (1989); Murphy Bernabe v. Tribunal Superior, supra.
A la luz de la normativa esbozada pasamos a discutir separadamente los errores planteados en relación con los señalamientos de error que cuestionan la interpretación y aplicación de la ley y del reglamento por la Junta de Planificación. Primeramente la Junta consideró el proyecto propuesto como un "desarrollo extenso" en atención a las Secciones 97.01 y 2.01 del Reglamento de Zonificación de Puerto Rico, Reglamento Núm. 4. La Sección 97.01 autoriza a la Junta a considerar y aprobar proyectos para "desarrollos extensos", independientemente del distrito en que se propongan. Por su parte, la Sección 2.01 define "desarrollos extensos", entre otros, como: "[djesarrolios residenciales para treinta o más familias o solares en pueblos o áreas con una población urbana censal entre diez mil (10,000) a cuarenta mil (40,000) personas...". Considerada la totalidad de la evidencia en el expediente administrativo, concurrimos con la Junta y con el tribunal recurrido en su apreciación de que el propuesto proyecto es un "desarrollo extenso". 
La Asociación nos plantea, en su segundo señalamiento de error, que el proyecto no cumple con el requisito de densidad poblacional según lo requiere la Sección 97.02 del Reglamento Núm. 4. Apoya su conclusión en que el Oficial Examinador de la Junta determinó que la propuesta consulta de ubicación incumple con la Sección 31.02 del PUT-RMSJ. La Junta, sin embargo, entendió que la disposición aplicable del PUT-RMSJ es la Sección 31.06, no la Sección 31.02 como concluyó el Oficial Examinador. Siendo ello así, determinó que:

"Este proyecto según sometido alcanza la densidad propuesta por el Plan de Usos de Terrenos.

La Sección 31.06 indica reservar para densidades bajas y medias bajas aquellos lugares que entre 
*640
otras condiciones no tengan acceso directo a través de una calle principal o avenida de acuerdo a las siguientes normas:

Autorizando los proyectos hasta una densidad bruta máxima de 20 familias por cuerda."

En vista de lo anterior, la Junta concluyó que el proyecto consta de 118 unidades de vivienda en un predio de 22.82 cuerdas, lo cual equivale aproximadamente a 5 unidades de vivienda por cuerda. Es este, precisamente, el tipo de interpretación y determinación administrativa especializada que merece nuestro respeto y deferencia. Aun cuando podamos diferir de ella, no nos parece que nos encontramos ante una actuación irrazonable, arbitraria o caprichosa a tal extremo que nos mueva a sustituir su criterio por el nuestro. En consecuencia, no intervendremos con su discreción.
El tercer señalamiento de error, es al efecto de que incidió el tribunal recurrido al considerar que la Junta cumplió con la Ley de Política Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. secs. 1121 et seq. En específico nos señala que no se preparó una Declaración de Impacto Ambiental del propuesto proyecto. Tampoco estamos de acuerdo.
De los autos surge que la Junta evaluó las repercusiones ambientales antes de autorizar la consulta de ubicación. Así se desprende de una comunicación del 14 de marzo de 1994 enviada por el Presidente de la Junta de Calidad Ambiental a la Presidenta de la Junta de Planificación, Hon. Norma E. Burgos Andújar, la cual en lo pertinente, reza:

"La Junta de Calidad Ambiental ha analizado el documento ambiental sometido para el proyecto de referencia.

Entendemos que al presentar el mismo su instrumentalidad ha cumplido con la fase de evaluar el posible impacto ambiental de la acción propuesta, de acuerdo con el Artículo 4(c) de la Ley sobre Política Pública Ambiental...". (Enfasis suplido.)
De la transcrita misiva surge no sólo que la Junta de Planificación evaluó el impacto ambiental del proyecto, sino que la Junta de Calidad Ambiental también determinó que en la fase de evaluar el posible impacto ambiental, la Junta de Planificación cumplió con la Ley sobre Política Pública Ambiental. Asimismo, Calidad Ambiental recomendó solicitar una determinación de jurisdicción del cuerpo de Ingenieros del Ejército de los Estados Unidos para que se identifiquen los terrenos inundados en el sector. La Asociación no nos ha puesto en posición de descartar esta presunción. Máxime cuando la propia Junta de Calidad Ambiental, en su función fiscalizadora, avaló la evaluación ambiental sometida por la Junta en tomo a la propuesta consulta de ubicación. Recordemos que existe una presunción de legalidad y corrección a favor de los procedimientos administrativos. No es función nuestra especular sobre qué hizo o no la Junta de Planificación, o la de Calidad Ambiental al evaluar el impacto ambiental, si la parte recurrente no nos evidencia el alegado incumplimiento de ia ley o el reglamento en adición a que omite indicarnos que disposiciones específicas del Reglamento sobre Declaraciones de Impacto Ambiental fueron desatendidas.
Añade la Asociación como parte de su señalamiento, que las calles de la urbanización La Mansión no pueden absorber el tráfico vehicular que generaría el propuesto proyecto residencial, creándole un serio problema ambiental a la comunidad. De los autos surge que Levitt presentó un estudio de tránsito preparado por el Ing. Heraldo Otero Torres. En el mismo se concluye que el nuevo desarrollo residencial, como resultado del desarrollo propuesto, no afectará significativamente el tráfico y que las calles de la urbanización La Mansión tienen la capacidad para absorber el nuevo flujo vehicular. La Asociación no acredita que presentara evidencia suficiente para controvertir dicho informe pericial. En su escrito, se limita a atacar las conclusiones del referido informe. Siendo ello así, no podemos rechazar la conclusión de la Junta referente a la capacidad del propuesto acceso por las calles de la urbanización La Mansión para absorber el nuevo flujo de vehículos sin crear mayores inconvenientes al tráfico y al ambiente.
Finalmente, la peticionaria sostiene que el tribunal a quo erró al determinar que la Junta podía variar la zonificación de la finca a desarrollarse sin acudir al mecanismo y procedimiento de variación dispuesto en la Sección 98.00 del Reglamento Núm. 4 que requiere, entre otros, la celebración de *641 vistas públicas. En particular, señala que el desarrollo en cuestión contempla unidades de vivienda en solares de 300 metros cuadrados en un área zonificada residencial uno (R-l), lo cual hace necesario variar previamente la zonificación del predio en cuestión mediante el procedimiento de variación, ya que dicha zonificación exige solares con cabida no menor de 900 metros cuadrados. Argumenta que por tal razón, la Junta no podía aprobar la consulta de ubicación sin antes considerar las disposiciones relativas al mencionado mecanismo de variación.
La Junta no tenía que hacerlo. Antes hemos aclarado que consideró la consulta de ubicación como un desarrollo residencial extenso. Utilizó los criterios para este tipo de proyecto, de acuerdo con las Secciones 97.01 y 97.02 del Reglamento Núm. 4 que permite a la Junta considerar cualquier tipo de proyecto independientemente del distrito en que se proponga. Así, a nuestro juicio, interpretó que no era necesario probar los requisitos de la Sección 98.05 sobre variación de usos de terrenos.
Esta controversia fue examinada por este Foro en el caso de San Río Realty Corp. v. Asociación de Residentes de Santa Bárbara, Núm. KLCE-95-00183 (Negroni Cintrón, Juez Ponente), resolución del 26 de febrero de 1997. Certiorari denegado por el Tribunal Supremo el 2 de mayo de 1997 en el caso CC-97-171. En lo pertinente al caso que nos ocupa, el tribunal expresó lo siguiente:

"Al igual que lo hizo el tribunal de instancia, hemos revisado cuidadosamente la Ley Núm. 75... y el Reglamento de Zonificación Núm. 4 y no hemos encontrado disposición alguna que apoye la posición de la Asociación. Por el contrario, la Ley Núm. 75... faculta a la Junta para dispensar el cumplimiento de uno o varios requisitos reglamentarios para poner en práctica el desarrollo urbano compacto, 23 L.P.R.A. sec. 62j(7), lo que evidentemente le permite considerar consultas de ubicación de proyectos como de desarrollo extenso, siempre y cuando se cumplan los requisitos establecidos para éstos.

Como puede verse, y contrario a lo que sostiene la Asociación, la Junta acogió la consulta de ubicación como un desarrollo extenso por estimar que el proyecto cumple con todos los requisitos.

En vista de ello, no era necesario que San Río aportara prueba para justificar cada una de las variaciones al Reglamento de Zonificación Núm. 4. Al considerar la Junta el proyecto como uno residencial extenso, las variaciones no eran pertinentes. La Junta entendió que lo que tenía que hacer era aplicar los criterios de la sección 97.2 del Reglamento Zonificación y lo hizo. Su proceder acorde con esa disposición legal merece deferencia por parte del tribunal revisor, ya que la agencia es a quien le compete administrarla.

En estas circunstancias, el señalamiento de error es claramente inmeritorio. Siendo la Junta el organismo administrativo con conocimiento especializado en el campo de la planificación y el uso de terrenos, su determinación de evaluar el proyecto ante su consideración como uno de desarrollo extenso, aplicándole los criterios dispuestos para ello por su propio reglamento, no es arbitraria, ilegal o en forma alguna irrazonable para que su decisión constituya un abuso de discreción." (Citas omitidas)
Nos persuade ese razonamiento. Por ende, lo adoptamos en lo pertinente a la situación de autos. En resumen, aquí la Junta, al evaluar la consulta de ubicación promovida por Levitt, consideró que la misma constituía un desarrollo extenso de acuerdo a las Secciones 97.01 y 97.02 del Reglamento Núm. 4. Es innecesario, por lo tanto, ordenar a la Junta que cumpla con los requisitos de la Sección 98.05 del mismo reglamento sobre variaciones de usos como pretende la Asociación que resolvamos.
Considerado todo lo anterior, se deniega la expedición del auto de certiorari solicitado por la peticionaria Asociación de Residentes de la Urbanización La Mansión.
El Juez Negroni Cintrón emite voto explicativo.
Lo acuerda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
*642 ESCOLIOS 98 DTA1
1. Se ha resuelto también que las calles son foros públicos tradicionales para los propósitos de ejercitar el derecho a la libre expresión. Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229 (1988).
2. Estamos conscientes que en virtud del poder de razón del estado un municipio puede controlar el acceso a las vías públicas por razones de seguridad, salud o bienestar público. Véase, Texaco v. Secretario de Obras Públicas, 85 D.P.R. 712, 723 (1962). Sin embargo, como ya expusimos, la Ley Núm. 21 regula esa facultad municipal para emitir autorizaciones de control de acceso.
3. Es preciso recordar que la Junta de Planificación es la encargada del desarrollo integral de la Isla, y de realizar la importante labor de planificar, zonificar y establecer el uso de terrenos en todo el país. Art. 4, Ley Núm. 75 de 24 de junio de 1956, según enmendada, 23 L.P.R.A. sec. 62c.
4. Cabe señalar que la recurrente realmente no cuestiona que el propuesto proyecto es un "desarrollo extenso".
VOTO EXPLICATIVO DEL JUEZ DE APELACIONES SR. NEGRONI CINTRON — 98 DTA 1
San Juan Puerto Rico, a 6 de octubre de 1997
Avalamos totalmente el dictamen que en esta fecha emite este Circuito. Ello no obstante, de rigor es que nuevamente exponga mi opinión sobre la controversia subyacente en el pleito particular que nos ocupa y en otros similares que hemos considerado con anterioridad; asunto que la Junta de Planificación de Puerto Rico ("Junta") debe considerar cuando evalúe proyectos como el que Levitt Homes, Inc. ("Levitt") le ha sometido.
Mediante recursos como el que nos ocupa al igual que en otros similares, resulta evidente que los residentes de las urbanizaciones y sus respectivas asociaciones de residentes legítimamente buscan proteger el sistema de control de acceso vehicular que establecieron en sus urbanizaciones, de conformidad con lo dispuesto en la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. see. 64 et seq., que estiman que constituye una amenaza a la estabilidad y permanencia del control de acceso que establecieron con el aval de la Ley. Estimo que en esos casos las Resoluciones de la Junta omiten atender esa válida preocupación.
En el 1987 la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 21, supra, para autorizar a las urbanizaciones y comunidades residenciales privadas y públicas a controlar el acceso vehicular y el uso público de sus calles residenciales. Aun cuando fue enmendada posteriormente, su propósito principal continuó siendo el de proveerle a nuestra ciudadanía un instrumento adicional para combatir la criminalidad y así procurar su cooperación activa en la lucha contra el crimen. Contribuye al mejoramiento de la seguridad y tranquilidad de las comunidades y vecindades que cualifiquen bajo la Ley para establecer el sistema de acceso controlado. Le permite a los residentes establecer unos medios para controlar el flujo de vehículos y el uso público, así como velar por su seguridad. Caquías Mendoza v. Asociación Residentes Mansiones de Río Piedras, Op. del 25 de agosto de 1993, 93 J.T.S. 127, pág. 11071.
De otra parte, la Ley Núm. 156 de 10 de agosto de 1988, 23 L.P.R.A. see. 64 et seq., le otorgó a todos los municipios del país la facultad de implantar, con el asesoramiento de la Junta de Planificación de Puerto Rico, las condiciones y requisitos necesarios para la concesión de autorizaciones para el control de acceso de vehículos de motor y de las calles, de conformidad con la Ley Núm. 21, supra. Esta, a su vez, estableció el procedimiento que han de seguir las personas interesadas en obtener un permiso de conformidad.
Como se aprecia de la lectura de ambas disposiciones, la Junta continúa siendo el organismo encargado de dirigir el desarrollo integral de Puerto Rico y de determinar los usos de los terrenos en Puerto Rico. Artículos 4 y 11 de la Ley Núm. 75 de 24 de junio de 1975, según enmendada, 23 *643 L.P.R.A. secs. 62c y 62j (14). Al ejercer esa función la Junta puede autorizar a proyectos como el ahora propuesto por Levitt a que pueda utilizar una calle de una urbanización como acceso al proyecto, aunque la urbanización disponga de un control de acceso vehicular a sus inmediaciones. No existe duda en cuanto a que ello también se permite dada la naturaleza pública que conservan las calles de una urbanización que haya obtenido permiso para establecer un sistema de acceso vehicular controlado a tenor de lo dispuesto en la Ley Núm. 21, supra. Caquías Mendoza v. Asociación Residentes Mansiones de Río Piedras, supra.
Ahora bien, los residentes de urbanizaciones con acceso vehicular controlado se obligan voluntariamente a contribuir al pago de los gastos, costos de instalación, operación y mantenimiento de los sistemas de control de acceso que adoptan por virtud de un permiso o licencia extendido por el municipio a que pertenecen. Independientemente de que no tengan razón al impedir el acceso a través de una calle de la urbanización, ciertamente los residentes tienen el perfecto derecho de solicitar que no se menoscabe o se torne en inoperante el control de acceso que establecieron de conformidad con la autoridad que la Asamblea Legislativa le confirió a través de la Ley Núm. 21, supra, y que sostienen con sus dineros.
Consciente de lo antes expuesto, opino que los residentes de una urbanización que hayan obtenido el correspondiente permiso o licencia para adoptar y establecer un sistema de control de acceso de conformidad con los requisitos de la Ley Núm. 21, supra, tienen el perfecto derecho de esperar y confiar en que el sistema de acceso vehicular controlado que establecieron será respetado por la Junta, pues lo han establecido después de haber obtenido autorización legal para ello. Tienen el derecho de que el permiso se preserve mientras no sea revocado por las causas enumeradas en la Sección 5 de la Ley Núm. 21, según enmendada, 23 L.P.R.A. sec. 64d. 
Debido a ello y en el descargo de su función ministerial, la Junta no sólo tiene el deber de reconocer y respetar el mismo porque ha sido autorizado de conformidad con la voluntad de la Asamblea Legislativa, sino que tiene la ineludible obligación de considerarlo en el momento de evaluar y aprobar cualquier proyecto o uso de terrenos que puedan afectar una urbanización con control de acceso vehicular.
El hecho de que las vías dentro de la urbanización mantengan su naturaleza pública no implica que la Junta puede obviar la existencia del control de acceso vehicular previamente concedido por un municipio a tenor de la Ley Núm. 21, supra. La Junta tiene que proceder reconociendo que, una vez un municipio ha concedido licencia para que una asociación de residentes de una urbanización establezca un control de acceso vehicular al tenor de la autoridad conferida por la Ley Núm. 21, supra, está obligada a respetar la existencia de ese control de acceso vehicular y no puede eliminarlo o menoscabarlo al aprobar un proyecto residencial nuevo contiguo a la urbanización con el control de acceso vehicular. Tiene que partir de la realidad de que el sistema de control de acceso existe, aunque ello no constituya impedimento para que la Junta apruebe nuevos proyectos residenciales.
Los gobiernos municipales de Puerto Rico tendrán facultad para aprobar aquellas ordenanzas municipales que sean necesarias para sancionar las violaciones a las disposiciones de las sees. 64 a 64g de este título o del reglamento promulgado a su amparo hasta un máximo de doscientos cincuenta (250) dólares por cada violación. Cada día en que se incurra en la misma violación será considerada como una violación separada.
No hacerlo en la Resolución que aprueba la Consulta de Ubicación del Proyecto podría dejar al azar la preservación del control de acceso ya establecido en La Mansión y contribuir a que éste se menoscabe.
ANTONIO J. NEGRONI CINTRON
Juez de Apelaciones
ESCOLIOS VOTO EXPLICATIVO DEL JUEZ DE APELACIONES SR. NEGRONI CINTRON — 98 DTA 1
1. "Control del tráfico de vehículos de motor y uso público en ciertas calles — Violaciones; revocación

*644
Cualquier violación o incumplimiento de los requisitos antes establecidos conllevará la revocación automática de la autorización, excepto cuando el permiso o autorización se haya inscrito en el Registro de la Propiedad de Puerto Rico según se autoriza en la sec. 64d-l de este título. Los gastos de desmantelar o remover las facilidades de control de acceso serán responsabilidad y por cuenta de los residentes y propietarios de la urbanización o comunidad concernida que favorecieron el control de acceso.

Cuando el permiso o autorización conste inscrito en el Registro de la Propiedad de Puerto Rico no se podrá revocar la autorización pero el municipio en donde ubique el desarrollo o lotificación podrá imponer sanciones, de existir una ordenanza municipal a tal efecto, a toda persona natural o jurídica responsable de violar o incumplir los requisitos antes establecidos. Cuando el permiso o autorización se haya solicitado por el urbanizador, el desarrollador o el constructor éstos serán responsables por dichos incumplimientos o infracciones mientras no se hayan vendido y entregado más del sesenta y cinco por ciento (65%) de las residencias, solares o lotes de que consta la urbanización, lotificación o lotificación simple. Cuando hubiese constituido un Consejo, Junta o Asociación de Residentes ésta será responsable del incumplimiento o infracción de las disposiciones de la sec. 64c de este Reglamento.

A tono con esta perspectiva, me preocupa que, en el caso que nos ocupa, el Acuerdo que la Junta tomó no incluyó condiciones específicas dirigidas a preservar el sistema de control de acceso establecido en La Mansión. Por ejemplo, no incluyó como condición de la aprobación de la consulta del proyecto propuesto por Levitt, que los residentes que adquieran inmuebles en el proyecto propuesto por Levitt quedan obligados a contribuir al sostenimiento económico del sistema de control de acceso vehicular ya establecido en La Mansión, mediante la inclusión de una cláusula en la escritura matriz de la nueva urbanización a esos efectos.

El lenguaje de la Resolución de la Junta sobre el particular debió ser más específico. De conformidad con lo dispuesto en la Sección 10(a) de la Ley Núm. 21, según enmendada, 23 L.P.R.A. see. 64 d-3(a), [2] con elfin de que los derechos adquiridos legalmente por los residentes de La Mansión queden protegidos y como condición para la aprobación del proyecto, la Junta debió asegurarse que los residentes del proyecto propuesto quedaren obligados a sufragar los costos del sistema utilizado por los residentes de La Mansión.

2. (a) El Consejo, Junta o Asociación de Residentes está facultada para imponer una cuota para cubrir los costos y gastos de instalación, operación y mantenimiento del sistema de control de acceso, incluyendo los salarios o jornales del personal contratado. Asimismo, está facultada para cobrar dicha cuota y reclamar la deuda a un propietario por este concepto por la vía judicial.

La obligación de pago recaerá en los siguientes propietarios:

"(1)...

"(2)...

"(3)...

"(4) Cuando la solicitud fue hecha por el urbanizador, desarrollador o el constructor, el pago de cuota será obligatorio para toda persona que advenga dueño del inmueble."